# Richmond

## Austin White v. Mamie Nelson Sands, Administratrix of the Estate of Lester Johnson Sands, Deceased.

January 16, 1956.

Record No. 4443.

Present, Hudgins, C. J., and Eggleston, Spratley, Buchanan, Miller and Smith, JJ.

The opinion states the case.

*Joyce & Stone*, for the plaintiff in error.

*Broaddus, Epperly & Broaddus*, for the defendant in error.

Eggleston, J., delivered the opinion of the court.

Lester Johnson Sands, an employee of the State Highway Department, while in the performance of his duties in connection with the improvement of State Highway No. 220, in Henry county, was struck and killed by an automobile driven by Austin White. Mamie Nelson Sands, administratrix of the estate of the decedent, filed an action for wrongful death against White. After a guardian ad litem had been appointed to defend the defendant, who was then an infant, and proper pleadings in his behalf had been filed, there was a trial before a jury which resulted in a verdict and judgment of $25,000 for the plaintiff. The matter is now before us on a writ of error granted the defendant. The parties will be referred to as they appeared in the trial court.

The principal contention of the defendant is that the verdict is contrary to the law and the evidence in that he was not guilty of negligence which was a proximate cause of the collision, but if he were, the plaintiff's decedent was guilty of contributory negligence which bars a recovery.

The accident occurred on July 7, 1953, about 11:00 a. m., at a point on Highway No. 220, in Henry county, between Martinsville on the north and Ridgeway on the south. The weather was clear and the pavement dry, but the dirt shoulders were wet from a recent rain. At the time a stretch of the highway extending approximately five miles was under construction. The roadway consisted of an 18-foot concrete pavement flanked on each side by a 3-foot shoulder of bituminous material. Under the construction project the entire 24-foot hard surface was being covered with "bituminous concrete." In preparation for this covering certain "broken places" in the original concrete surface were being removed and patched. Sands, a foreman, and Frank A. Howard, the resident engineer of the Highway Department, were locating and marking these broken or defective places for removal.

Prior to the accident they were examining the pavement on a straight stretch of the highway where the visibility was good for a distance of several hundred yards in either direction. In their examination of the pavement Howard and Sands walked southwardly along the western dirt shoulder. When they reached a spot which Howard determined to be defective and should be removed, he so indicated to Sands who marked it by making a mark on the shoulder with his heel or by placing a small stick in the shoulder opposite such spot. The defective places extended across the entire width of the

concrete and the indicating marks were made or placed on the shoulder nearest the spot to be treated.

Immediately prior to the collision both men had crossed the pavement to examine a defective spot on the "right-hand side of the road," "coming towards Martinsville," that is, on the eastern side of the pavement. Howard testified that after they had examined the spot, he "turned around and started up the road" along the western shoulder "to line up the next place to be patched." He did not see what course Sands took, but as he said, "I thought he was following me." He observed that traffic was heavy but paid no attention to the approach of "this particular car" driven by White. Suddenly he heard the noise of "squealing" brakes and tires. He looked around and saw the northbound car driven by White strike Sands in the "right-hand lane" and carry his body about 150 feet along the roadway. Sands was killed instantly and the car came to rest with all four wheels on the right-hand or eastern shoulder. Howard estimated the speed of the car to be about 50 miles an hour.

A State trooper who reached the scene shortly after the collision testified that there were skid marks by the car for a distance of 60 feet along the northbound lane of the pavement and for a distance of 147 feet along the adjacent shoulder. The marks further showed that the brakes had been applied 36 feet before the car reached the point of impact.

The only eyewitness to the collision, other than Howard, was the defendant, White. He testified that he was in the Air Force and was bound on a trip from his home in Rockingham, North Carolina, to his post at Pittsburgh, Pennsylvania. He said that he approached the scene, going north, at about 45 to 50 miles an hour; that he noticed two men, who turned out to be Sands and Howard, about 250 to 300 feet ahead of him, "facing" him, and walking southwardly along "the extreme edge of the pavement or on the shoulder" on the western side of the highway; that as he neared the couple and was "within about 50 feet of them," he noticed that "one of the men had turned and started directly across the road" towards the path of the car; and that just as this man, who turned out to be Sands, neared the center line, he (White) applied his brakes and "pulled to the right." To use his words, "Everything happened so fast I didn't have time to use my horn. Just as I saw him—a split second after I saw him—he looked up and saw me, but instead of staying where he was, which was well out of the way of the car, he made a dash in front of me. I was on

my right-hand side but on the surface of the road at the time it hit, and immediately thereafter I was off of the road on the slick, wet shoulder, and my car skidded for some distance before it stopped."

He further described the conduct of decedent just before the collision in this manner: "He turned his head and saw me and then he made a dash in front of me, apparently to try and beat me and get across the road, but I was right on him at the time he made the dash." Again, he said that the collision would have been averted if Sands had "stood still where he was when he saw me," that he "was out of the way" and would not have been hit.

There was evidence on behalf of the plaintiff that at the southern end of the construction work the Highway Department had erected four signs on the eastern side of the highway. The first of these was a large sign with black and yellow stripes which the witnesses stated indicated a barricade or danger ahead. Next in turn was the conventional yellow sign reading, "ROAD UNDER CONSTRUCTION." The next sign confronting the driver of a northbound car was a large white sign with dark letters reading, "THIS CONSTRUCTION IS FOR YOUR FUTURE COMFORT AND SAFETY, DRIVE CAREFULLY—VIRGINIA DEPARTMENT OF HIGHWAYS." Then followed the "informational" sign giving the number of the construction project. The place of the collision was about a mile north of these signs. Similar signs were placed at the northern end of the construction project on the west side of the highway and facing the driver of a southbound car. Between these two sets of signs there were no others giving notice of the construction. The "MEN WORKING—25 MPH" signs usually placed near where the actual work is being carried on had not been posted.

The defendant, White, testified that he observed these signs placed at the southern end of the project and slowed down his speed "slightly" to about 45 to 50 miles an hour and proceeded along the road. He saw no signs located near the point of collision which indicated the presence of workmen there.

We may assume, without deciding, that the defendant driver was guilty of negligence which proximately caused the collision. Even so, it clearly appears from the uncontradicted evidence that plaintiff's decedent was guilty of contributory negligence which bars a recovery here.

It is true, as the plaintiff argues, that the authorities agree that a workman whose duties require him to work on that part of a high-

way used by passing cars, is not required to exercise the same care and keep the same lookout for cars as an ordinary pedestrian. This is so because such a workman must necessarily devote a considerable part of his attention to his work, while an ordinary pedestrian may devote his entire attention to a safe passage and to passing vehicles. Hence, such a workman is not required to be constantly on the lookout for passing motor vehicles. He may assume that the driver of a car will use reasonable care commensurate with the visible conditions to avoid injuring him. But such a workman must nevertheless use ordinary care, that is, such care as a reasonably prudent person under the same or similar circumstances would use, for his safety. Whether in a particular case a workman on the highway has exercised the care required of him is usually for the jury. Huddy Cyclopedia of Automobile Law, 9th Ed., Vol. 5-6, § 106, p. 180 *ff*; Blashfield Cyclopedia of Automobile Law and Practice, Perm. Ed., Vol. 2-A, § 1577, p. 517 *ff; Annotation*, 5 A. L. R. (2d), p. 769 *ff*.

But the present case is not one in which a workman, absorbed with his work in a traffic lane, is struck down by a passing car which he failed to see. While the duties of decedent required him from time to time to go onto the pavement and into the traffic lanes used by passing cars, there is no evidence that at the time of the collision and just prior thereto he was absorbed or engaged in work on the pavement which required his close attention thereto. The undisputed testimony of Howard is that he and Sands had completed their examination of a defect on the eastern side—that is, in the northbound lane—of the pavement and were turning their attention towards looking for other defects in the road ahead. With this object in view, Howard started ahead along the western side of the road and entirely clear of the lane in which the car was being driven by White. Howard did not see Sands again until the moment of the impact.

The uncontradicted testimony of White is that Sands, for some reason undisclosed by the evidence, abandoned his course along the western side of the road and started to cross from west to east; that when the car was about 50 feet away, Sands "turned his head," saw the approaching car, "made a dash in front" of it, and tried to "get across" ahead of it. But, as White said, "I was right on him at the time he made the dash," and he (White) did not have time to avoid the collision. Moreover, White testified, if Sands "had stood still where he was when he saw me," he was "out of the way" and would not have been struck.

Not only is this testimony of White clear and uncontradicted, but it is the only direct evidence as to just how the collision occurred. If it be disregarded, the accident is unexplained.

Thus the uncontradicted evidence is that at the time of the collision decedent was not absorbed with work in the lane of traffic. He was walking across the road. As he did so, not only was the approaching car in plain view but he actually saw it, left a place of safety and tried to cross ahead of it when it was dangerously close upon him. Under elementary principles he was guilty of contributory negligence, for it was, or should have been, apparent to him that such an undertaking was extremely dangerous and would probably result in the tragedy which occurred.

For these reasons the judgment is reversed, the verdict of the jury set aside, and a final judgment here entered in favor of the defendant.

*Reversed and final judgment.*